## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
　　　　　　　　　　　　　　　　　　　　　)
ALLISON DEXTER, a/k/a ALLISON　　　　　)
DEXTER-GALVIN,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　　Civil Action
v.　　　　　　　　　　　　　　　　　　　　)　　　No. 19-10572-PBS
　　　　　　　　　　　　　　　　　　　　　)
DEALOGIC, LLC,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendant.　　　　　)
_____)

## MEMORANDUM AND ORDER

July 26, 2019

Saris, C.J.

### INTRODUCTION

Plaintiff Allison Dexter brings this civil action against her former employer, Defendant Dealogic, LLC ("Dealogic"), to challenge her termination in March 2018. She alleges that Dealogic retaliated against her after she raised concerns with senior executives about the quality of the company's product and its deceptive marketing. She also claims Dealogic terminated her because she became pregnant and discriminated against her on the basis of gender by requiring her to sign a noncompetition agreement as a condition of her severance package. Finally, she alleges that she endured a hostile work environment due to her

1

gender. She raises a host of statutory and common law theories in her six-count complaint.

After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Dealogic's motion to dismiss (Docket No. 23).

## BACKGROUND

The following factual background comes from the complaint and attached exhibits and must be taken as true at this stage. See Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 25 (1st Cir. 2018).

Dexter, a woman in her early thirties, resides in Cohasset, Massachusetts. She has worked in sales and marketing since graduating from college. In 2015, two business contacts asked her to work as a sales executive at their new company, A2 Access. They had developed a platform for private equity firms and wanted Dexter to help build relationships with firms around Boston. She accepted the offer.

Before Dexter began the job, A2 Access was acquired by Dealogic, a London-based company offering a financial markets platform to financial firms. On September 28, 2015, Dexter agreed to become a sales executive in Dealogic's Boston office. Her employment with Dealogic was at will. She began the position in January 2016. Around this time, certain unspecified senior executives at Dealogic questioned her hiring, as well as that of another Boston-based female sales executive, saying that they

2

were likely to "get married, have kids and leave the Company."
Dkt. No. 22 ¶¶ 18-19 ("FAC"). The complaint does not explain how
or when Dexter learned of this comment but notes that the other
female sales executive informed human resources about it when
she left the company.

During her orientation, Dexter realized the product she
would be promoting was not as complete as Dealogic had told her
when they were discussing her potential employment.
Nevertheless, she pitched the product to investment institutions
in Boston throughout 2016. She made some sales, but Dealogic was
unable to deliver a product that performed as promised.
Customers therefore began to cancel their orders.

On December 17, 2016, Dexter met with Teri Hawksworth,
Dealogic's global head of sales and coverage. Hawksworth asked
Dexter why she was unable to "land big investors" in the Boston
area. FAC ¶ 30. Dexter explained that the ongoing problems with
the product were hurting its marketability and sales. Hawksworth
had not previously been aware of these problems. Two days later,
John Dunchick, Dealogic's chief business development officer,
learned of Dexter's meeting with Hawksworth and admonished
Dexter that "it was bad for [her] career to highlight product
concerns to senior executives." FAC ¶¶ 31-32 (alteration in
original). Still, Dexter earned an overall score of 3.2 out of
5.0 in her January 2017 annual performance review, which was

considered "Solid Performance: good work, meeting expectations."
FAC ¶ 33. She received a number of positive comments, including
that her "work this year [was] going to pay off." FAC ¶ 34.

Throughout 2017, while Dexter refused to misrepresent the
capabilities of the company's product to prospective clients,
she frequently observed other Dealogic personnel making false
statements about the product's functionality. For example,
Dunchick and Michael Muniz, the global head of sales and account
management, provided false information about nonexisting product
capabilities during a sales pitch to one of Dexter's business
contacts in April 2017. Dexter threatened to report them to
senior executives but did not do so. Shortly thereafter,
Hawksworth and Muniz told Dexter she was being reassigned from
her sales executive position to an account management role. The
new position involved lower pay and a different bonus structure
based strictly on her ability to retain clients. Hawksworth
explained that the company thought her strong business
relationships would allow her to better retain clients in this
new role. Dexter continued to feel uncomfortable with Dealogic's
misleading statements about its product and made repeated
attempts to raise the issue with management.

In August 2017, Dealogic held a number of meetings to
address its product issues. Afterwards, two sales executives who
had spoken up about their concerns with the product were placed

4

on performance improvement plans. Senior executives prohibited
account managers from interacting with high risk clients to
avoid communications that might trigger those clients to
terminate their contracts with Dealogic. Despite her concerns
about this new policy, Dexter received a 3.1 out of 5.0 in her
January 2018 annual performance review, again showing "Solid
Performance: good work, meeting expectations." FAC ¶ 45. Because
of her strong client retention rate, she earned a $12,500 bonus
for fiscal year 2017.

Dexter learned in November 2017 that she was pregnant with
her first child. In February 2018, she told Greg Young, the head
of onboarding and her former manager, about her pregnancy. He
reassured her she had continued job security with Dealogic. She
told her other colleagues about her pregnancy the next month.
Shortly thereafter, on March 21, 2018, Dunchick and Brianna
Markey, the head of human resources, informed her she was being
terminated as part of a reduction in force and there were no
other positions available for her. Dexter alleges that Dealogic
planned to rebrand the account management position with a new
title and hire younger men who did not know about the product
problems and would not leave to have children. Dealogic offered
Dexter a severance package conditioned on her execution of a
one-year noncompetition agreement. She rejected the severance
package because of this condition. Two of Dexter's male

colleagues who were let go around the same time, including Young, were not required to sign noncompetition agreements in exchange for severance.

After receiving authorization from the Massachusetts Commission Against Discrimination, Dexter filed suit against Dealogic in state court on February 11, 2019. Dealogic removed the suit to federal court on the basis of diversity jurisdiction. On May 15, 2019, Dexter filed an amended complaint narrowing her causes of action to six: retaliation (Count I), gender and pregnancy discrimination and hostile work environment in violation of Mass. Gen. Laws ch. 151B, § 4 (Count II), wrongful termination (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), breach of oral contract/promissory estoppel (Count V), and civil conspiracy (Count VI). Dealogic has moved to dismiss the amended complaint in its entirety.

## STANDARD OF REVIEW

When faced with a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must set aside any statements that are merely conclusory and examine only the pleader's factual allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief." Id. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

## DISCUSSION

### I.   Retaliation (Count I)

In Count I, Dexter alleges that her demotion and termination were unlawful retaliation in violation of the Massachusetts Whistleblower Act ("MWA"), Mass. Gen. Laws ch. 149, § 185, for raising concerns about and refusing to participate in Dealogic's attempts to misrepresent the nature of its product to customers. The MWA bars public employers from retaliating against employees who object to or refuse to participate in unlawful activity. Id. § 185(b)(3); Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014). The MWA applies only to public sector employers. See Mass. Gen. Laws ch. 149, § 185(a)(2) (defining "employer" as "the commonwealth, and its agencies or political subdivisions"). Because Dealogic is private company, Dexter cannot maintain an MWA claim. See Cabi v. Bos. Children's Hosp., 161 F. Supp. 3d 136, 158-59 (D. Mass. 2016) (dismissing an MWA claim because it was brought against a nonpublic employer); Ahanotu v. Mass. Turnpike Auth., 466 F. Supp. 2d 378, 395-96 (D. Mass. 2006) (same). Accordingly, Count I is dismissed.

7

## II. __Mass. Gen. Laws ch. 151B (Count II)__

Dexter raises two sets of claims under Mass. Gen. Laws ch. 151B in Count II: 1) gender and pregnancy discrimination and 2) a hostile work environment. The Court addresses the two theories in turn.

### A. __Gender and Pregnancy Discrimination__

To state a claim for employment discrimination under Massachusetts law, the plaintiff must allege "that she is a member of a protected class, she suffered harm as a result of an employer's adverse employment action, and the employer harbored discriminatory animus, which was the determinative cause of the adverse action." Weber v. Cmty. Teamwork, Inc., 752 N.E.2d 700, 711 (Mass. 2001). Both gender and pregnancy are protected classes. See Mass. Gen. Laws ch. 151B, § 4(1). Massachusetts courts define "adverse employment action" broadly to include any effect on the terms, conditions, or privileges of employment that is "substantial enough to have materially disadvantaged an employee." Yee v. Mass. State Police, 121 N.E.3d 155, 161-62 (Mass. 2019) (quoting Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 530 (Mass. 2011)). Terms of employment include explicit or implied contractual terms between the employer and employee. Id. at 160 n.6. An employee suffers a material disadvantage "when objective aspects of the work environment are affected" that would be "apparent to a reasonable person in the employee's position."

8

Id. at 162 (quoting King v. City of Boston, 883 N.E.2d 316, 323 (Mass. App. Ct. 2008)).

Dexter contends that Dealogic discriminated against her in two ways: 1) terminating her once she became pregnant;[1] and 2) requiring her, but not her male colleagues, to sign a noncompetition agreement as a condition of receiving a severance package. In support of the first theory, Dexter alleges she received positive performance reviews for two years and then was terminated shortly after informing her colleagues she was pregnant. She also claims Dealogic management questioned the employment of young women who might become pregnant and planned to hire men to fill the rebranded sales roles. These factual allegations raise a plausible inference that Dealogic terminated her because of her gender and pregnancy.

Dealogic points out that Dexter does not specifically plead that any decisionmaker involved in her termination knew she was pregnant. A plaintiff need not, however, "allege every fact necessary to win at trial," as long as "the allegations of the

---

[1]     To the extent Dexter alleges Dealogic violated Mass. Gen. Laws ch. 151B by demoting or terminating her in retaliation for raising product and marketing concerns, this theory fails to state a claim because she was not engaged in protected activity. See Mole v. Univ. of Mass., 814 N.E.2d 329, 338 n.13 (Mass. 2004) (explaining that protected activity includes opposing unlawful employment discrimination, filing a complaint, testifying or assisting in an employment discrimination proceeding, and assisting or encouraging others in opposing employment discrimination).

complaint make the claim as a whole at least plausible."
Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 24
(1st Cir. 2014) (quotations omitted). Dexter's allegation that
she told her colleagues about her pregnancy shortly before her
termination supports a plausible inference that the
decisionmakers knew of her pregnancy.

Dealogic also argues that Dexter alleges elsewhere in her
complaint that she was terminated for raising her product and
marketing concerns, not because of gender or pregnancy
discrimination. This discrepancy does not justify dismissal of
her adequately pleaded discrimination claim because a "plaintiff
may present as many claims . . . as [she] has, even if they are
inconsistent with each other." McGrath v. Town of Sandwich, 169
F. Supp. 3d 251, 256 (D. Mass. 2015) (citing Fed. R. Civ. P.
8(d)(3)).

In support of her second theory, Dexter alleges that, while
she was required to sign a noncompetition agreement as a
condition of her severance package, two male colleagues who were
let go around the same time were not. A requirement to sign a
noncompetition agreement affects the terms of employment between
an employer and employee and would be material to a reasonable
employee. This theory therefore adequately alleges an adverse
employment action to support a claim of gender and pregnancy
discrimination. And the fact that two male colleagues did not

have to sign a noncompetition agreement renders plausible the inference that Dealogic imposed this requirement on Dexter due to her gender and pregnancy.

Dealogic asks the Court to ignore the allegations about the noncompetition agreement because the draft severance agreement Dexter attached to her complaint appears to waive Dealogic's right to enforce her "non-competition obligations as set forth in Dealogic Standard Non-Competition Agreement." Dkt. No. 22-6 ¶ 10. Dealogic points out that this term contradicts Dexter's allegation that the noncompetition agreement was a requirement of her acceptance of the severance package. See Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (quotation omitted)). While the exhibit does appear to contradict her allegations, Dexter claims someone in human resources told her she had to sign a noncompetition agreement as a condition of her severance. The record is unclear on this point, and the Court cannot resolve this factual dispute on a motion to dismiss.

**B.    Hostile Work Environment**

Dexter also alleges that she endured a hostile work environment based on her gender and pregnancy. See Coll.-Town, Div. of Interco, Inc. v. MCAD, 508 N.E.2d 587, 590-91 (Mass.

1987) (recognizing that an employee may bring a hostile work environment claim under Mass. Gen. Laws ch. 151B). "A hostile work environment is one that is so 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization'" that it "poses a formidable barrier to the full participation of an individual in the workplace." Pelletier v. Town of Somerset, 939 N.E.2d 717, 731 n.32 (Mass. 2010) (quoting Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 937 (Mass. 2001)).

Determining whether a work environment is hostile requires a fact-specific analysis of the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Thompson v. Coca-Cola Co., 522 F.3d 168, 180 (1st Cir. 2008) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)) (applying Massachusetts law).

The sole harassment or abuse based on gender or pregnancy that Dexter specifically alleges in her complaint is a comment by unnamed senior executives that she should not have been hired because she would just "get married, have kids and leave the Company."[2] FAC ¶¶ 18-19. While the complaint indicates that they

---

[2]     In her discussion of the hostile work environment claim, Dexter includes Dunchick's statement to her that "it was bad for

made this comment when she was hired and that a colleague
mentioned the comment to human resources when she left the
company, Dexter does not allege when she herself learned about
it. The only reasonable inference from this omission is that she
did not learn about the comment until afterwards. She therefore
cannot plausibly claim that the comment affected her ability to
participate in the workplace. See Aponte-Rivera v. DHL Sols.
(USA), Inc., 650 F.3d 803, 808 (1st Cir. 2011) (noting that
under Title VII the offensive conduct "must create . . . the
plaintiff's subjective perception that the environment is
abusive"). Dexter therefore fails to state a claim for a hostile
work environment.

## III.  **Wrongful Termination (Count III)**

In Count III, Dexter pleads a claim of wrongful termination
in violation of public policy. "The baseline common law rule in
Massachusetts is that an employer may lawfully terminate a
relationship with an at-will employee at any time -- for any
reason, for no reason, and even for a reason that might be seen
by some as unwise or unkind." Murray v. Warren Pumps, LLC, 821

---

[her] career to highlight product concerns to senior
executives." FAC ¶ 32 (alteration in original). She fails to
explain why this statement contributed to a hostile work
environment based on her gender or pregnancy. See Roy v. Correct
Care Sols., LLC, 914 F.3d 52, 62 (1st Cir. 2019) (explaining
that a hostile work environment claim under Title VII requires
harassment directed at the plaintiff at least in part due to her
membership in a protected class like gender)

F.3d 77, 89 (1st Cir. 2016). Massachusetts law recognizes an exception to this rule to "protect[] at-will employees from terminations that conflict with sufficiently important and clearly defined public policies." Id. Courts interpret this public policy exception narrowly to avoid altering the baseline rule of at-will employment. Barbuto v. Advantage Sales & Mktg., LLC, 78 N.E.3d 37, 50 (Mass. 2017). The dispositive question "is whether a well-established public policy is served by denying the employer the right freely to discharge an employee for engaging in particular conduct." Shea v. Emmanuel Coll., 682 N.E.2d 1348, 1349 (Mass. 1997). Whether discharging an at-will employee for engaging in particular conduct violates public policy is a question of law for the court, and an at-will employee bears the burden of showing that it does. Murray, 821 F.3d at 90.

Massachusetts courts have delineated three categories of justifications for termination of an at-will employee that violate public policy: 1) "asserting a legally guaranteed right (e.g., filing workers' compensation claim)"; 2) "doing what the law requires (e.g., serving on a jury)"; 3) and "refusing to do that which the law forbids (e.g., committing perjury)." Id. at 89 (quoting Smith-Pfeffer v. Superintendent of Walter E. Fernald State Sch., 533 N.E.2d 1368, 1371 (Mass. 1989)). An employee may also recover if she is terminated for performing certain

important public deeds not strictly required by the law. Id. For example, employees are protected from discharge when they make "an internal complaint . . . about the alleged violation of the criminal law," Shea, 682 N.E.2d at 1350, or "report, resist, or refuse to participate in activity that presents a threat to public health or safety," Surprise v. Innovation Grp., Inc./First Notice Sys., Inc., 925 F. Supp. 2d 134, 148 (D. Mass. 2013).

On the other hand, "the public policy exception does not protect at-will employees from termination for performing generally socially desirable duties or for raising workplace complaints about internal company matters." Murray, 821 F.3d at 89-90; see also Shea, 682 N.E.2d at 1350 (explaining that an employer is not liable for terminating an employee who makes an "internal complaint about company policies or the violation of company rules"). "Nor does it extend so far as to cover all acts by an employee that are directed to illegal, unsafe, or unethical conduct." Surprise, 925 F. Supp. 2d at 148. For example, while Massachusetts law may protect an at-will employee who raises concerns about serious instances of fraud, see Mello v. Stop & Shop Cos., 524 N.E.2d 105, 108 (Mass. 1988) (leaving open the possibility that "a discharge for whistleblowing concerning false claims against manufacturers and suppliers" could support a wrongful termination claim), an

employer may terminate an employee who speaks up about defective

products that do not threaten public health or safety,

Mistishen v. Falcone Piano Co., 630 N.E.2d 294, 295-96 (Mass.

App. Ct. 1994) (rejecting a claim of wrongful termination based

on an employee's internal concerns that her employer was selling

defective pianos in violation of Mass. Gen. Laws ch. 93A because

her concerns ultimately involved the internal company policy of

whether to honor its warranties).

Dexter's complaint includes vague allegations that

Dealogic's product did not work as advertised and that she felt

she had to make misrepresentations about the product to sell it

to prospective customers. She does not, however, plead what

precisely was wrong with the product or what specific

misstatements she felt she had to make. Her claims that other

Dealogic employees made false and misleading marketing claims

about the product are equally vague. Dexter's nebulous

allegations are insufficient to support a reasonable inference

that Dealogic fired her for raising concerns about a serious

fraud in the marketing of its product, as opposed to internal

issues the company had creating the platform. Dexter's wrongful

termination claim is therefore dismissed.[3]

---

[3]     To the extent Dexter's wrongful termination claim alleges
that Dealogic fired her based on her gender and pregnancy, it is
duplicative of her claim under Mass. Gen. Laws ch. 151B and must
be dismissed. See Valerio v. Putnam Assocs. Inc., 173 F.3d 35,

**IV.**  **Breach of the Covenant of Good Faith and Fair Dealing (Count IV)**

Count IV raises a claim for breach of the implied covenant of good faith and fair dealing. "[I]mplicit in all Massachusetts contracts, including contracts for employment at will," Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 8 (1st Cir. 2011) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 629 (Mass. 2001)), the implied covenant "requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract," Buffalo-Water 1, LLC v. Fid. Real Estate Co., 111 N.E.3d 266, 279 (Mass. 2018) (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010)).[4] However, "the 'scope of the covenant is only as broad as the contract that governs the particular relationship,'" and it "cannot create rights and duties not otherwise provided for in the existing contractual relationship." Id. (quoting T.W. Nickerson, 924 N.E.2d at 704).

Dexter alleges two breaches of the implied covenant. First, she claims Dealogic induced her to work for the company by

---

45-46 (1st Cir. 1999); see also Logie v. MBTA, 323 F. Supp. 3d 164, 175 (D. Mass. 2018) (dismissing a plaintiff's wrongful termination claim that was "duplicative of her claim for unlawful termination based on disability under the ADA").

[4]   Because the parties assume Dexter's employment contract is governed by Massachusetts law, the Court does as well.

misrepresenting the quality of its product. Dealogic made no promises concerning its product in her employment contract, however, and the implied covenant cannot create a duty owed to her concerning the quality of the company's product that does not already exist in the contract.

Second, she claims Dealogic terminated her after she became pregnant even though the company indicated that her position was secure. But Plaintiff cannot base an implied covenant claim on her allegation of pregnancy discrimination because Mass. Gen. Laws ch. 151B "provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." Charland v. Muzi Motors, Inc., 631 N.E.2d 555, 559 (Mass. 1994); see also Dyer v. E. Coast Diners, LLC, 33 F. Supp. 3d 82, 89-90 (D. Mass. 2014) (dismissing an implied covenant claim alleging sex discrimination because of Chapter 151B's exclusivity provision); Edsall v. Assumption Coll., 367 F. Supp. 2d 72, 78-79 (D. Mass. 2005) (same for a claim of race and sex discrimination).

Finally, Massachusetts law recognizes an implied covenant claim where an employer fails to pay a terminated employee for work already performed. See Cochran v. Quest Software, Inc., 328 F.3d 1, 8 (1st Cir. 2003). This cause of action does not, however, "protect interests contingent on an event that has not occurred," Harrison, 744 N.E.2d at 631, such as lost

18

compensation of any sort for future services, see King v. Driscoll, 673 N.E.2d 859, 862 (Mass. 1996). Plaintiff's complaint is devoid of any allegation that Dealogic did not pay her compensation due for services already rendered, and she instead seeks damages for only prospective lost wages, benefits, and bonuses. See Robert Reiser & Co. v. Scriven, 130 F. Supp. 3d 488, 496 (D. Mass. 2015) (dismissing a counterclaim for breach of the implied covenant brought by a terminated employee because he failed to allege that his termination deprived him of benefits he had already earned). Count IV is therefore dismissed.

## V.    **Promissory Estoppel (Count V)**

In Count V, Dexter seeks to recover via promissory estoppel. A claim for promissory estoppel requires "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 14 (1st Cir. 2014) (quoting Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court, 858 N.E.2d 699, 711 (Mass. 2006)). The representation must be an "unambiguous promise" on which the plaintiff could have reasonably relied. AthenaHealth, Inc. v.

May, 290 F. Supp. 3d 108, 112 (D. Mass. 2018) (quoting Upton v. JWP Businessland, 682 N.E.2d 1357, 1360 (Mass. 1997)).

Although Dexter conclusorily asserts that Dealogic made promises of promotions, compensations, and benefits, she does not allege any specific promises Dealogic made to her. Her positive performance reviews were not by themselves an unambiguous promise of continued employment since her employment was at will. Her 2017 review noted that her "work this year [was] going to pay off," FAC ¶ 34, but this statement is too vague to serve as an enforceable promise, see AthenaHealth, 290 F. Supp. 3d at 112 (holding that an employer's promise that an at-will employee "would have absolutely nothing to worry about in the transition" was "too ambiguous to be enforceable under the doctrine of promissory estoppel"). So is Young's reassurance that Dexter had continued job security after she told him she was pregnant. Finally, even if Dealogic made a promise of continued employment, Dexter fails to allege that she detrimentally relied on this promise by, for example, declining another job opportunity. Count V is therefore dismissed.

## VI.  Civil Conspiracy (Count VI)

In Count VI, Dexter raises a claim of true civil conspiracy, which is "a very limited cause of action in Massachusetts." Snyder v. Collura, 812 F.3d 46, 52 (1st Cir. 2016) (quoting Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D.

Mass. 1985)). A true conspiracy exists only where the
"defendants, acting in unison, had some peculiar power of
coercion over plaintiff that they would not have had if they had
been acting independently." Thomas v. Harrington, 909 F.3d 483,
490 n.8 (1st Cir. 2018) (quoting Aetna Cas. Sur. Co. v. P&B
Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994)). Under this
theory, "the 'wrong' suffered by the plaintiff is 'in the
particular combination of the defendants rather than in the
tortious nature of the underlying conduct.'" Snyder, 812 F.3d at
52 (quoting Kurker v. Hill, 689 N.E.2d 833, 836 (Mass. App. Ct.
1998)). The plaintiff therefore need not prove an underlying
tort. See Kurker, 689 N.E.2d at 836. Civil conspiracy requires
an agreement among the co-conspirators; joint acts are not
sufficient by themselves. See Gutierrez v. MBTA, 772 N.E.2d 552,
568 (Mass. 2002).

Dexter alleges that Dealogic conspired with its executives
to exert a coercive power over her as part of the events leading
to her termination. This claim fails for two reasons. First,
while she alleges a number of independent incidents throughout
her employment (including the comment that the company should
not hire young women, Dunchick telling her she should not
highlight product concerns to senior executives, her demotion to
the account management role, and her termination), she does not
plead any facts that suggest that the various executives

21

responsible for these incidents acted pursuant to any agreement

Parallel unlawful activity does not constitute a conspiracy. <u>See</u>

<u>Grant v. John Hancock Mut. Life Ins. Co.</u>, 183 F. Supp. 2d 344,

363 (D. Mass. 2002).

Second, Dexter fails to allege that the unified actions of

the Dealogic executives allowed them to exert a coercive power

over her that they would not have had as individuals.

<u>See</u> <u>Carroll v. Xerox Corp.</u>, 294 F.3d 231, 243 (1st Cir. 2002)

(affirming dismissal of a true conspiracy claim alleging that

the plaintiff's two supervisors conspired to induce him to

accept a job transfer because the complaint did not support an

inference that the two supervisors had a special power of

coercion over him acting in unison). Dexter's complaint suggests

that all of the executives whose behavior she complains about

were her superiors. They therefore all had coercive power over

her already, and any agreement to act in unison would not have

increased this power. For both reasons, Count VI is dismissed.

### ORDER

For the foregoing reasons, Dealogic's motion to dismiss

(Docket No. 23) is **ALLOWED IN PART** and **DENIED IN PART**. Count I

(retaliation), Count III (wrongful termination), Count IV

(breach of the implied covenant of good faith and fair dealing),

Count V (promissory estoppel), and Count VI (civil conspiracy)

are dismissed in their entirety. Count II (Mass. Gen. Laws ch.

151B) is dismissed except insofar as Dexter alleges gender and pregnancy discrimination concerning her termination and Dealogic's imposition of a noncompetition agreement.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge